IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DENIS BIBICHEV,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        1:12cv129
                                   )
TRIAD INTERNATIONAL                )
MAINTENANCE CORPORATION,           )
                                   )
                Defendant.         )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This employment action is before the court on Defendant's[1] motion for summary judgment. (Doc. 24.) Plaintiff has responded (Doc. 36), and Defendant has replied (Doc. 38). For the reasons set forth below, the motion will be granted and the case dismissed.

## I.    BACKGROUND

The facts, construed in the light most favorable to Plaintiff as the non-moving party, show the following:

Plaintiff Denis Bibichev ("Bibichev") was born to ethnic Russian parents in what is now Uzbekistan in the former Soviet Union. He considers himself an ethnic Russian and ethnic Slav (an historic term including ethnic Russians). His parents

---

[1]    Defendant TIMCO Aviation Services, Inc., was dismissed with prejudice by stipulation after the filing of the present motion. (Doc. 30.)

brought him to the United States in 1995 when he was 14 years old. Although his first language was Russian, he attended high school, learned English and, in 2001, became a United States citizen. (Doc. 25-1 ("Plaintiff Dep.") at 16-19.[2])

Defendant Triad International Maintenance Corporation ("TIMCO")[3] first hired Bibichev as an aircraft mechanic in 2005. (Plaintiff Dep. at 20-27.) He worked for TIMCO until 2006, when he left to work for another company. (Id. at 31.) In March 2008, Bibichev applied for and was offered positions by both TIMCO and PACE Airlines. He took the position with PACE but was laid off in December 2008 when it faced financial difficulties. In early 2010, Bibichev obtained employment with Storm Aviation to work for it under the supervision of TIMCO team leaders and management. (Id. at 35-39, 43-46.) In June or July 2010, Storm Aviation informed Plaintiff that TIMCO no longer needed his services, and he was laid off. (Id. at 49-52.)

Bibichev claims that during his work for Storm Aviation he overheard TIMCO employee and fellow team member Nathaniel (Nate) Flippin ("Flippin") say the following to others: "crazy Russian," "lazy Russian," and "crazy Russian conspiracy

[2] Portions of Plaintiff's deposition are found in Doc. 25-1, Doc. 36-1, and Doc. 36-2. While some pages appear in one document but not the other, the court will reference "Plaintiff Dep." generally.

[3] The parties stipulate that former Defendant TIMCO Aviation Services, Inc., never employed Plaintiff but that TIMCO was its wholly-owned subsidiary from January 1, 2010, through December 31, 2011. (Doc. 29.)

theorist." (Id. at 58-62.) Flippin also allegedly said, "Denis, that crazy Russian." (Id. at 62-63.) Plaintiff was the only ethnic Russian on the team. (Id. at 62.) During this time, Bibichev never complained about Flippin's comments or witnessed any hostile behavior or derogatory comments by Flippin toward him personally. (Id. at 57-61, 81.)

On September 27, 2010, TIMCO hired Bibichev as an employee. It provided Bibichev a copy of its employee handbook and new-hire probationary policy. (Id. at 92-93, 97, 100-101, 233-35.) After initial assignments, shortly after December 25, 2010, TIMCO assigned Bibichev to a newly-formed team lead by Flippin, where Bibichev was the only ethnic Russian. (Id. at 120-23, 206.)

On January 12, 2011, Flippin informed Bibichev that his work performance was below expectations and provided guidance on what was needed to improve. (Id. at 140-41; Doc. 25-4, Flippin Dep. at 39-41.) Bibichev resolved to "work harder," although he denied that improvement was needed. At deposition, he could not identify any action he took to improve performance other than to "work harder." (Plaintiff Dep. at 151-57, 248-49.)

Flippin says that he continued to be dissatisfied by Bibichev's performance after the January 12, 2011 meeting and brought his concerns to TIMCO Human Resources Manager Clarissa Carl ("Carl"), who informed him that he could extend Bibichev's

3

90-day new-hire probationary period (beyond the December 27, 2010 expiration). (Flippin Dep. at 41-43.) On January 18, 2011, Flippin and his manager, Robert Nelson ("Nelson"), met with Bibichev to discuss their concerns about his allegedly non-improving performance (including assertions that he was performing unassigned tasks and was a slow worker) and informed him that his new-hire probationary period was being extended 60 days. (Plaintiff Dep. at 159-60.) Bibichev disagreed that his performance needed improvement. (Id. at 160-64; Doc. 37-3, Plaintiff Dep. Ex. 5.) He persisted in his view that he had done nothing wrong and noted that he had never been written up or had any problem with a supervisor during any prior time with TIMCO. (Plaintiff Dep. at 160-64, 232, 234-35, 247-49.)

The day after the January 18, 2011 meeting, Bibichev met with Randy Crews ("Crews"), a TIMCO employee formerly assigned as his supervisor, to review a prior written performance evaluation.[4] The evaluation was dated December 10, 2010, and therefore covered just over the first two months of Bibichev's employment.[5] (Doc. 37-4, Plaintiff Dep. Ex. 6.) Crews told Bibichev that the evaluation covered work from the day he started at TIMCO and was based on information from Scott Sass

---

[4] Bibichev had been assigned to a team led by Crews but was reassigned after Crews was injured in a motorcycle accident and became unable to lead the team. (Id. at 112-115.)

[5] The delay likely reflects Crews's absence in late 2010 due to his motorcycle accident.

(who had replaced Crews as supervisor of the team prior to the December 2010 assignment to Flippin's team) and others. According to Bibichev, Crews told him he was a good employee and that others were saying good things about him. (Plaintiff Dep. at 167-69.) The evaluation gave Bibichev a score of 5 on a scale of 1 to 10 -- the lowest score for "meets requirements" (with scores of 3 and 4 being "below expectations" and 1 and 2 being "unacceptable"). Of each of the fourteen specific criteria considered, Bibichev consistently scored a 5. (See Doc. 37-4, Plaintiff Dep. Ex. 6.) Consequently, the evaluation stated that "performance results consistently meet job requirements."

After the January 18, 2011 meeting, Flippin continued to be dissatisfied with Bibichev's performance (Flippin Dep. at 46-49), and Bibichev continued to disagree with that assessment (Plaintiff Dep. at 271-72). At unspecified times during this period (January 2011), Bibichev again overheard (but did not see) Flippin "joking about me, you know, 'Russian, crazy conspiracies[']; 'lazy -- lazy Russian'; you know, 'crazy Russian.'" Flippin did not make these comments to Bibichev. (Id. at 195-96, 204-09.)

On February 9, 2011, while working on an aircraft, Bibichev used his flashlight to check the anti-ice ducts located behind access panels in the wings. At the end of the shift, he could

5

not locate the flashlight but clocked out and headed out even though company policy required that the loss of a tool be reported because it could pose a safety concern. (Id. at 130-31.) Bibichev says he reported the missing flashlight "right away" to Flippin[6] (id. at 130), although admittedly after he (Bibichev) had left his shift. Bibichev later returned to work (according to Bibichev, shortly thereafter (id. at 131); according to TIMCO, roughly an hour later (Flippin Dep. at 48)) and told Flippin, "Listen, I want to double-check, making sure I did not forget that flashlight at one of the compartments, because this is a dangerous situation." (Plaintiff Dep. at 131.) Bibichev offered to look on his own time. (Id.) The aircraft had to be partially disassembled, but the flashlight was never found. (Id.; Flippin Dep. at 48-49.)

The next day, TIMCO terminated Bibichev. (Plaintiff Dep. at 132.) TIMCO's February 10, 2011 "Record of Written Warning, Reprimand, or Discharge" stated the reason as "Unsatisfactory Probation." In a separate section, it provided: "Termination due too [sic] unsatisfactory probation due too [sic] poor work performance. Individual[']s probation was extended 60 days on 12-27-2010 thru 02-25-201[1]. After further evaluation the

---

[6]  In a February 15, 2011 email to Carl, Bibichev makes no mention of an immediate alert to Flippin. Instead, Bibichev stated, "I do not see how you can claim that somebody is unsafe when they come back to work to tell their Supervisor that their flashlight is missing and that i [sic] wanted to double check on my own time . . . ." (Doc. 37-7 at 1.)

6

individual continued to perform unsatisfactory [sic] after placed on 2nd probation." (Doc. 37-5, Plaintiff Dep. Ex. 8.)

Bibichev was provided an opportunity to comment, which he did. He denied the reasons for his termination, which he called "accusations" that were "completely false." (Id.) He said he was not slow but had decided to seek help when Flippin "refused" to help, denied that he had endangered any aircraft by placing a boom close to it, and said that he had reported the lost flashlight after he had clocked out but returned on his own time and looked for it by disassembling panels on an aircraft for about an hour and one-half. (Id.) He concluded that he believed his treatment was "because of my ethnic nationality," noting, "I am Russian and I know people do not like [me] because of that." (Id.) He claimed that TIMCO's reasons were "illegitimate" and part of an effort "to get rid of me based on personal hate." (Id.) Bibichev reiterated this sentiment in an e-mail to Human Resources Manager Carl. (Doc. 37-7, Plaintiff Dep. Ex. 9.)

Bibichev requested a peer review hearing regarding his termination. (Doc. 37-6, Plaintiff Dep. Ex. 9 (Feb. 10, 2011 email from Bibichev to Carl).) On February 17, 2011, he met with Todd Walker ("Walker"), TIMCO's Director of Maintenance, and John R. Huff ("Huff"), TIMCO's Director of Human Resources. (Plaintiff Dep. at 278-81, 293-96.) Bibichev told both men that

7

he believed there had been no deficiencies in his performance. (Id. at 295-96.)

After the meeting, Huff, Walker, and Nelson discussed Bibichev's concerns. (Doc. 25-3, Huff Dep. at 68-74.) Huff and Walker noted that, although Bibichev had been terminated after a probationary period, the human resources manager had not verified it. (Id. at 69.) Huff also discussed Crews' evaluation of Bibichev, noting that it was a part of "catching up some evaluations" when Crews returned from leave when he was unaware of subsequent issues relating to Bibichev. (Id.) Huff "felt there may have been confusion," so they "made the decision that the right thing to do was to reinstate Mr. Bibichev's employment." (Id. at 70.) The reinstatement would not ignore the performance issues with Bibichev but, according to Huff, was intended to move forward with a "performance improvement plan and a disciplinary action to make sure that he understood that while we were bringing him back he still had performance issues that he needed to correct if we were going to continue to work with him." (Id. at 71.)

Huff met with Bibichev on February 23, 2011, to reinstate his employment. Huff informed Bibichev that as part of reinstatement, the discharge would be rescinded and replaced with a reprimand and that a performance improvement plan would be prepared. (Plaintiff Dep. at 296-98.) But Bibichev declined

8

to sign any agreement on the grounds that criticisms of his performance were false and Flippin was discriminating against him because he was Russian. (Id. at 297-98 ("That's the only reason why he came up with this false accusation to get rid of me.").) Bibichev refused to acknowledge any performance problems and maintained that he had "done everything correctly." (Id. at 301-02.)

As a result of the impasse, Huff sent Bibichev a letter that informed him of his separation from employment effective February 27, 2011. Huff enclosed a revised Record of Written Warning, Reprimand, or Discharge, which noted:

> [Y]ou refused to accept that you had any examples of poor performance and displayed an attitude that showed you are unable to address our expectations about the improvements you need to make in order to remain employed by TIMCO. While we were willing to reinstate your employment, we explained that your actions did require disciplinary action and also a Performance Improvement Plan to address concerns identified by your Team Leader and Manager.

(Doc. 25-2, Huff Dep. Ex. 28.) The document listed (as the most serious) the incident where Bibichev was seen positioning a boom lift poorly while hydraulics were activated on an aircraft, which was "about to cause significant aircraft damage." (Id.) It also noted that he was unable to perform work on a timely basis on certain tasks in an area he should be competent to do, which required that others be assigned to his work. (Id.) Finally, it noted that he "expressed unacceptable behavior"

during a meeting with Carl, TIMCO's HR Manager, during which "she felt it necessary to contact security" to have him removed from the property because he "became excessively loud with her and began taking photos in her office" with his cell phone and recorded comments on his cell phone, which was against clear company policy.[7] (Id.) The document concluded, "[b]ecause of the above situations and because you demonstrated no understanding of the performance problems your Team Leader and Manager identified, we have chosen to terminate your employment effective immediately." (Id.)

TIMCO presents the declarations of two of it mechanics who worked for Flippin and who consider themselves Slavic -- Elvis Sakonjic ("Sakonjic"), born in Yugoslavia, and Ivan Manolov ("Manolov"), born in Bulgaria. Sakonjic, who began working for Flippin in September 2011, states that many employees with different national origins, ethnicities, races, and genders work or have worked for Flippin, and he has never seen or heard Flippin mistreat any of them. He has also never heard Flippin insult anyone's national origin, race, or ethnicity and does not believe Flippin ever would. He considers Flippin a great supervisor. (Doc. 28.) Manolov worked for Flippin from August 2011 to February 2012 and again beginning March 8, 2013. He has

---

[7] This refers to a February 15, 2011, encounter with Carl when Bibichev returned to obtain certain documentation. (See Plaintiff Dep. at 285-87; Doc. 36 at 6.)

never seen or heard Flippin discriminate against anyone based on where they were born or how they spoke and, in his experience at TIMCO, Flippin was one of the best supervisors, for whom he would work anytime. (Doc. 27.)

TIMCO also states that from September 2008 until the commencement of the lawsuit, at least 35 TIMCO employees (excluding Bibichev) who exhibited a pattern of poor work performance or were unable or unwilling to correct that deficiency were discharged. Of these, fifteen were White, eleven were African-American, eight were Hispanic, and one was Asian. (Doc. 26, John R. Huff Declaration.) To the best of Huff's knowledge, none of the discharged employees (other than Bibichev) was born in Uzbekistan or in any country that either had been part of the Soviet Union or was Slavic. (Id.)

## II. ANALYSIS

Bibichev asserts national origin discrimination under both Title VII and the public policy of North Carolina, citing N.C. Gen. Stat. § 143-422.2. In interpreting section 143-422.2, North Carolina courts, looking to federal decisions for guidance in establishing evidentiary standards and principles of law, have applied the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). North Carolina Dep't of Corr. v. Gibson, 308 N.C. 131, 136-141, 301 S.E.2d 78, 82-85 (1983); see Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.

1995). The parties have treated the two causes of action together for purposes of summary judgment, and the court will do the same.

**A. Summary Judgment Standard**

Summary judgment is appropriate where the pleadings, affidavits, and other proper discovery materials demonstrate that no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to a material fact. <u>Celotex</u>, 477 U.S. at 323. If this burden is met, the nonmoving party must then affirmatively demonstrate a genuine dispute as to a material fact which requires trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

There is no issue for trial unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>Sylvia Dev. Corp. v. Calvert Cnty.</u>, 48 F.3d 810, 817 (4th Cir. 1995). Moreover, on summary judgment, the nonmoving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved

12

favorably to him." _Metric/Kvaerner Fayetteville v. Fed. Ins._
_Co._, 403 F.3d 188, 197 (4th Cir. 2005) (quoting _Charbonnages de_
_France v. Smith_, 597 F.2d 406, 414 (4th Cir. 1979)). "Where the
record taken as a whole could not lead a rational trier of fact
to find for the non-moving party, there is no 'genuine issue for
trial.'" _Matsushita_, 475 U.S. at 587.

B.   **Title VII: Wrongful Termination**

Title VII makes it an unlawful employment practice for an
employer "to . . . discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's . . . national origin."
42 U.S.C. § 2000e-2(a)(1).  A Title VII plaintiff may survive a
summary judgment motion through one of two avenues of proof.  A
plaintiff may establish through direct or circumstantial
evidence that his protected status, though not the sole reason,
was a "motivating factor" in his employment termination.  _See_
_Diamond v. Colonial Life & Accident Ins. Co._, 416 F.3d 310, 318
(4th Cir. 2005).  Alternatively, he may use the burden-shifting
proof scheme established by the Supreme Court in _McDonnell_
_Douglas_.  _Id._  Though acknowledging the availability of the
first avenue, Bibichev's opposition to Defendant's motion for
summary judgment proceeds under the _McDonnell Douglas_ framework.
Thus, the court will do likewise.

13

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination, at which point the burden shifts to the defendant to articulate some "legitimate, non-discriminatory reason" for its action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the employer carries its burden of production, the presumption of discrimination raised by the prima facie case "drops out of the picture" and the ultimate burden remains with the employee to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 142-43 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). The summary judgment standards mesh comfortably with the McDonnell Douglas framework. To establish pretext, a plaintiff cannot focus on "minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, 451 F.3d 311, 315-16 (4th Cir. 2006).

### 1. Prima Facie Case

Under the McDonnell Douglas burden-shifting approach:

> To establish a prima facie case of wrongful termination under Title VII, [the plaintiff is] required to establish that: (1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; (3) [he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment

14

action; and (4) the position remained open or was
filled by similarly qualified applicants outside the
protected class.

Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285

(4th Cir. 2004) (en banc opinion); see King v. Rumsfeld, 328

F.3d 145, 149 (4th Cir. 2003). The Supreme Court has

characterized a plaintiff's initial burden in a Title VII case

under McDonnell Douglas as "not onerous," Burdine, 450 U.S. at

253 (disparate treatment case), and the Fourth Circuit has

described it as "relatively modest," Brant v. Aiken Reg'l Med.

Ctrs., Inc., 333 F.3d 536, 545 (4th Cir. 2003).

TIMCO asserts that Bibichev cannot meet his burden to show

either that (1) his job performance was satisfactory to meet

TIMCO's legitimate expectations, or (2) "other employees who are

not members of the protected class were retained under

apparently similar circumstances."[8] (Doc. 25 at 15.) On the

latter point, TIMCO asserts that "all Plaintiff offers to

satisfy his burden is that on February 28, 2011 [the day after

Bibichev was terminated], 'an A&P Mechanic named Bennett started

with Nate Flippin's team.'" (Doc. 38 at 3.) Thus, TIMCO

concludes, "Plaintiff evidently expects the court to assume that

---

[8] Defendant's articulation of the fourth element varies from that of
Plaintiff. The Fourth Circuit has used varying formulations in
different opinions for the fourth element. The Fourth Circuit
recently set out the prima facie elements for wrongful termination
claims and for disparate treatment claims. See Scott v. Health Ned
Fed. Servs., LLC, 463 F. App'x 206, 208 (4th Cir. 2012) (unpublished
per curiam opinion).

15

this employee filled Plaintiff's position outside his protected class." (Id.) To be sure, Bibichev's showing is weak, at best. But TIMCO does not contest the claim that this employee took over Bibichev's position and was of a different nationality. Ultimately, the court need not dwell on this element in light of the reasoning to follow, and the court therefore will assume that this element has been met.

This court has referred to the required showing that a plaintiff was performing up to the employer's legitimate expectations as a "relatively easy test." Rishel v. Nationwide Ins. Co., 297 F. Supp. 2d 854 (M.D.N.C. 2003) (quoting Young v. Lehman, 748 F.2d 194, 197 (4th Cir. 1984)). The standard is not a hollow one, however. Bibichev claims that he always did things "by the book" and never made a single mistake. (See, e.g., Plaintiff Dep. at 295.) But a plaintiff's "perception of himself . . . is not relevant. It is the perception of the decision maker which is relevant." Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Bibichev is left to rely, therefore, on the review communicated by Crews the month before he was fired. As noted, that review was based on information current as of December 10, 2011, was communicated by a prior team leader who had not directly supervised Bibichev, and stated that his performance was satisfactory although at the lowest rank that would so qualify.

It is the "employer's legitimate expectations at *the time of the adverse employment action*" that matters.  <u>Hill</u>, 354 F.3d at 285 (emphasis added).  In this case, TIMCO has presented substantial evidence that at that time Bibichev was not meeting its legitimate expectations.  He had created the potential for significant damage by positioning a boom too near the tail of an aircraft, failed to perform work timely,[9] and photographed a superior (Carl) and recorded her telephone calls in her office in violation of company policy.  Bibichev has not presented any evidence, other than his self-serving statements, to dispute these events.  Therefore, the court finds that he has failed to demonstrate that at the time of his termination he was meeting his employer's legitimate expectations, and Defendant is entitled to summary judgment on this basis.

### 2. Legitimate, Non-Discriminatory Reason

Even if Bibichev could establish his prima facie case under <u>McDonnell Douglas</u>, he has not demonstrated that he could survive the remainder of the burden-shifting test.  Once a prima facie case has been shown, the burden shifts to the defendant to produce a legitimate, non-discriminatory explanation for the decision.  The burden on a defendant at this stage is one of

---

[9]  Flippin testified that although at first Bibichev "was doing good," "he began to not get his jobs done in the allotted amount of time and he would continue to walk around and talk to people.  He wouldn't stay on his job.  He just wasn't performing to what all the other mechanics were doing . . . ."  (Doc. 36-5, Flippin Dep. at 48.)

production, not persuasion, and the court's analysis "can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). At this stage, the employer "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992).

TIMCO argues that it discharged Bibichev because he "exhibited a pattern of unsatisfactory work performance, insisted that his work performance was beyond reproach, and refused to take any action or participate in any plan to conform his performance to his employer's standards. In other words, TIMCO did not want to retain an employee who was determined to substitute his own standards of performance for those of his employer." (Doc. 25 at 17.) Bibichev does not argue against a finding that TIMCO has stated a legitimate, non-discriminatory reason under McDonnell Douglas. (See Doc. 36 at 11.) The court finds, therefore, that the employer's explanation suffices to meet this element of the analysis.

### 3. Pretext

Once an employer meets its burden of producing a legitimate, non-discriminatory reason, "the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered

18

explanation is unworthy of credence." Reeves, 530 U.S. at 143 (internal quotation marks omitted). The question, therefore, is whether Bibichev has presented or forecast evidence that Defendant's reason was not the true reason, but was a pretext for discrimination, sufficient to survive the summary judgment motion. See id.

Bibichev correctly points out that plaintiffs rarely have direct evidence of an employer's state of mind. (See Doc. 36 at 13.) In that asserting Defendant's grounds were pretext, he advances two principal arguments.

First, Bibichev contends that the testimony of TIMCO witnesses is not worthy of credence, citing alleged contradictions. But in many cases, the alleged contradictions are not contradictions at all. For example, Bibichev asserts that Flippin gave different reasons for the January 18, 2011 probation extension. (Doc. 36 at 13-14.) In his deposition, Flippin testified that Bibichev "as a mechanic [] wasn't meeting the standards that we – I felt like he was supposed to be doing as a mechanic at TIMCO." (Flippin Dep. at 34-35.) When pressed for examples, Flippin cited an incident involving a check valve that Bibichev represents was not mentioned in his termination. The record makes clear, however, that Flippin provided this example of deficient work only after he ran out of other examples, which were previously communicated. (Id. at 35-39.)

19

Bibichev also points to a discrepancy between Flippin's testimony that their January 12, 2011 meeting took place in the TIMCO hangar and Nelson's testimony that it took place in Nelson's office.[10] It is undisputed that Nelson and Flippin met with Bibichev on January 18 in Nelson's office to discuss the extension of the probation period. The notice for the January 18 meeting stated that on January 12 Bibichev was "verbally counseled." When asked about the January 12 counseling, Nelson said he was present, stated it occurred in his office, but acknowledged it was two years ago. (Doc. 36-8, Nelson Dep. at 26; see id. at 42.) Whatever the truth, a dispute over where they met on January 12 is immaterial. Finally, the court has examined Bibichev's other alleged inconsistencies (such as who typed up the initial termination order and how much work was undertaken as a result of his report of a lost flashlight), and finds that they fail to rise to the level of supporting pretext.

Second, Bibichev argues that TIMCO failed to follow its own policies and procedures when dealing with him, although it did for others. He notes that the TIMCO employee handbook "states that, following the 90-day probationary period, the company will deal with performance problems not amounting to rule breaking by issuing the employee a performance improvement plan." (Doc. 36

---

[10] In support of Nelson's statement, Bibichev cites an unrelated page of *Flippin's* deposition. (Doc. 36 at 14-15.) It appears the reference is meant to be to page 26 of *Nelson's* deposition.

20

at 19.) He points out that his 90-day probationary period expired December 26, 2010, and says that no one mentioned an extension of the probation period until Flippin extended the period in January 2011. (Id.) According to Bibichev, "Human Resources Director John Huff testified that the Company always follows the policies in the Employee Handbook." (Id. (citing Huff Dep. at 77-79).) He states that February 10, 2011, was the first time he had received any disciplinary action and that the employee handbook "requires the use of the progressive disciplinary process." (Id.)

Bibichev's arguments on these points are unpersuasive for two reasons. First, they misstate Huff's deposition testimony. Huff testified that TIMCO took the Handbook "very seriously" and when asked, "does the management *try* to follow those policies?" responded, "I believe so." (Doc. 36-6, Huff Dep. at 78 (emphasis added).) Huff similarly answered "I believe so" to the question, "In your experience then the *intention* of the senior leadership at TIMCO is to follow the policies in the handbook?" (Id. at 78-79 (emphasis added).) In any event, Huff's testimony is clear that TIMCO attempts to follow the employee handbook while recognizing that no system is perfect.[11]

---

[11] This is consistent with the employee handbook, whose introduction informs the employee that "This Handbook is not a contract and the policies and procedures in it may be amended, revoked, revised or supplemented by the Company, and – under certain circumstances – the Company may make exceptions. You should think of this Handbook as a

(See id. at 78.)  Second, Bibichev's objection for not having been assessed graduated discipline by first being put on a performance improvement plan ultimately was mooted when TIMCO became concerned that the employee handbook may have contemplated such an approach and in fact offered it to him.  It was Bibichev's refusal to participate in such a plan, based on his contention that he had made no mistakes and was not in need of any improvement, that led to his termination.

Bibichev also argues that the employee handbook gives him a right to a peer review that he did not receive.  The employee handbook does note that sometimes mistakes are made and the Peer Review Program was developed to minimize them.  (Doc. 37-2, Plaintiff Dep. Ex. 4 at 34.)  It also states, however, that certain reasons for discharge are not eligible for peer review. A non-exhaustive list includes "Failure to successfully complete a Performance Improvement Plan."  (Id. at 35.)  As noted, Bibichev was given an opportunity to operate under a performance improvement plan but declined to do so because he believed he did not warrant one.[12]

---

guide only . . . ."  (Doc. 37-2 at 6.)  Further, the employee handbook notes that progressive discipline is applied "generally" to "minor infractions," contrary to Bibichev's assertion that it was required in his case.  (See id. at 34.)

[12]  Bibichev also claims that the fact he was treated differently from others with respect to TIMCO's employee handbook is evidenced by a February 25, 2011 aircraft incident report regarding a Boeing 767 serviced by Flippin and two other mechanics.  (Doc 36 at 6-8.)

TIMCO also relies on the Fourth Circuit's recent opinion in Volochayev v. Sebelius, No. 11-2229, 2013 WL 871193 (4th Cir. March 11, 2013), an unpublished decision. Such decisions are not precedential but have value for the persuasiveness of their reasoning. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning" (citation omitted)). In Volochayev, the employee, of Russian descent, was removed from his position after committing a number of errors. He alleged

---

According to the report, TIMCO mechanics' failure to correctly perform landing gear service caused the main gear to "bottom[] out," which could be a safety issue. (Doc. 36 at 6-8 (citing deposition of David Latimer (Doc. 36-7) & Latimer Dep. Ex. 32 (Doc. 37-13)).) The employees were disciplined but not terminated. This example is of no moment, because Bibichev was terminated not only because of his violations but also because he refused to participate in the performance improvement plan.

Bibichev also claims that TIMCO's reliance on his alleged failure to timely report the loss of his flashlight as a reason for his termination was pretextual. According to TIMCO, about an hour after Bibichev went home, he came back and said, "I've lost my flashlight. I think it's inside the leading edge of the airplane." (Doc. 36-5 at 48.) Flippin testified that they removed all the leading edge panels but never found it. At that point, he said, Bibichev "started claiming that the inspector must have stole[n] it." (Id. at 49.) According to Flippin, "at that point I'd had enough." (Id.) Bibichev points to another incident where an employee believed he left a flashlight in an aircraft that resulted in its disassembly as they searched unsuccessfully for it, but who was not terminated. TIMCO notes that the difference is that this other employee notified the company once he realized his flashlight was missing and before he left for the day, in accord with company policy, whereas Bibichev did not, in violation of the policy. (Doc. 36-4, Crews Dep. at 38-39.) In any event, TIMCO did not cite this reason in its February 27, 2011 termination notice and nevertheless articulated adequate other reasons.

evidence of national origin animus among his supervisors, claiming they made "disparaging remarks about Russians, calling them rude, insubordinate, and overly fond of Vodka." 2013 WL 871193, at *2. The Fourth Circuit rejected his argument that his supervisors' alleged anti-Russian comments constituted direct evidence of discrimination. The court stated, "Even viewing the evidence in Volochayev's favor and assuming the comments were actually made, Volochayev has put forth no evidence that the stray comments had any direct bearing on his firing, as required under Phipps, 67 F.3d at 1143. Without some closer nexus, we cannot conclude that the remarks raise an inference that Volochayev's firing was motivated by an impermissible bias." 2013 WL 871193, at *3.

Here, Bibichev has failed to demonstrate that the comments attributed to Flippin, albeit his team leader actively involved in the initial termination decision, were anything more than stray comments and that they had a direct bearing on his firing. The comments simply do not demonstrate the "closer nexus" to raise an inference that his firing was motivated by impermissible bias.[13]

---

[13] Although Bibichev's opposition cites his deposition testimony that he overheard Flippin refer to him as a "crazy Russian," "lazy Russian," or similar references both during prior employment and later when Flippin was his team leader (Doc. 36 at 2-4), Bibichev does not revisit these allegations except with respect to his general assertion of discrimination based on national origin (id. at 9) or with respect to statements he made to others regarding his belief that Flippin

Therefore, the court concludes that, even if Bibichev could meet the burden of his prima facie case, there is no genuine dispute of material fact which could lead a reasonable jury to find that Defendant's articulated reasons were a pretext. TIMCO is therefore entitled to summary judgment.

## III. CONCLUSION

For the reasons noted herein,

IT IS THEREFORE ORDERED that the motion for summary judgment by Defendant Triad International Maintenance Corporation (Doc. 24) is GRANTED, and this action is DISMISSED.

A separate Judgment will issue.

                                    /s/   Thomas D. Schroeder
                                    United States District Judge

June 14, 2013

---

discriminated against him because he was Russian (id. at 20) or to point out that two declarants were not Russian despite having a Slavic background (id. at 22). This lack of argument is apparently due to his exclusive focus on the McDonnell Douglas approach. Even in a mixed motive case, however, a plaintiff must establish that national origin was a motivating factor in the decision to terminate employment. Hill, 354 F.3d at 284. Evidence must not only reflect a discriminatory attitude, but must also bear directly on the contested employment decision. Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Bibichev has failed to make such a showing.